IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 26, 2024 Session

**BRAYLEN BENNETT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 107676   Steven Wayne Sword, Judge**

————————————————————

**No. E2022-01746-CCA-R3-PC**

————————————————————

The Petitioner, Braylen Bennett, appeals the denial of his petition for post-conviction relief, arguing that he was denied the effective assistance of trial counsel, that his guilty pleas were unknowing, unintelligent, and involuntary, and that the cumulative effect of trial counsel's deficiencies in performance warrants post-conviction relief.  Based on our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and MATTHEW J. WILSON, JJ., joined.

Ann C. Short, Knoxville, Tennessee (at hearing and on appeal) and Donald Bosch, Knoxville, Tennessee (at hearing), for the appellant, Braylen Bennett.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the Petitioner's participation with six other men in a June 26, 2014 home invasion-robbery that resulted in the shooting death of the homeowner, John Huddleston.  In October 2014, the Knox County Grand Jury returned an indictment

charging the Petitioner, Melvin King, Roderick Curtis, Dwaine Love, and Charles Byrd with twenty-five felony offenses: three counts of aggravated burglary (in concert with two or more persons); one count of employing a firearm during the commission of an aggravated burglary; two counts of the especially aggravated kidnapping of Jeremiah Gilman; two counts of the especially aggravated kidnapping of John Huddleston; eight counts of the first degree felony murder of John Huddleston; one count of the aggravated assault of Sydney Smith (in concert with two or more persons); two counts of the attempted especially aggravated robbery of Daniel Nicely; two counts of the attempted especially aggravated robbery of Jeremiah Gilman; one count of aggravated animal cruelty for killing a companion animal; and one count of aggravated animal cruelty for seriously injuring a companion animal. *See State v. King*, No. E2016-01043-CCA-R3-CD, 2017 WL 2242295 at *1 (Tenn. Crim. App. May 22, 2017), *perm. app. denied* (Tenn. Sept. 20, 2017). The other two men involved in the crimes, identified as "BJ" and Brandon Phelps, had not been located by the police by the time of Co-Defendant King's trial. *Id.* at *3-4.

On the morning that his trial was scheduled to begin, the Petitioner accepted a plea offer from the State that resulted in his pleading guilty to the lesser offense of facilitation of first degree felony murder and to the other offenses as charged in the indictment, many of which were merged, in exchange for an effective sentence of forty years in the Tennessee Department of Correction ("TDOC"), with the first twenty-five years to be served at 100% for an especially aggravated kidnapping conviction and the remaining fifteen years at 30% for the facilitation of first degree murder conviction. As a condition of his pleas, the Petitioner agreed to be debriefed by the police and to testify truthfully if called as a witness at Co-Defendant King's trial. Co-Defendants Curtis, Love, and Byrd received the same plea bargain as the Petitioner, and Co-Defendants Curtis and Byrd ultimately testified for the State at Co-Defendant King's trial.

According to the stipulated facts recited by the prosecutor at the Petitioner's guilty plea hearing, in the early morning hours of June 26, 2014, Drew Nicely, Sydney Smith, Jeremiah Gilman, and Cody Hall were with Mr. Huddleston at Mr. Huddleston's Knoxville home. Mr. Huddleston was in his back bedroom, Mr. Nicely and Ms. Smith were in their bedroom, and Mr. Hall and Mr. Gilman were sleeping and/or watching television on the sectional sofa in the living room when someone lightly knocked on the door. Believing that it was his brother who lived next door, Mr. Gilman got up to answer the door. As he was about to open it, the door was forced open and a group of men rushed inside demanding to know the location of the "dope."

In the chaos that followed, Mr. Gilman was held at gunpoint by one of the intruders, while Mr. Hall was held at gunpoint by another. Other intruders rushed through the house searching for marijuana. Some of these men forced Mr. Huddleston from his bedroom to

the living room, where they sat him in a chair and demanded the "dope." Others kicked in the bedroom door of Mr. Nicely and Ms. Smith, where Co-Defendant King, whom Mr. Nicely recognized from an earlier encounter, pointed a gun at Mr. Nicely's face as he demanded to know the location of the drugs. Although not specifically mentioned by the prosecutor in the recitation of facts, Mr. Nicely, who rented a room from Mr. Huddleston, "sold marijuana from the house and often kept cash and a quantity of marijuana in a small safe or in other locations around the house." *Id*. at *1.

In the meantime, Mr. Gilman was complying with the demands of intruders in the living room by disconnecting the Xbox from the television and placing it in a backpack. At some point, Mr. Huddleston grabbed his own gun and ran down the hall to help Mr. Nicely and Ms. Smith. However, instead of shooting the intruders, Mr. Huddleston attempted to tackle them. Although he managed to get the intruders away from Mr. Nicely and Ms. Smith, he was killed when Co-Defendant King fired multiple gunshots that struck him in the arm, midsection, and head. Ms. Smith suffered a gunshot wound to her leg, and two pet dogs in the home, a pit bull and a beagle, were both shot, with the pit bull dying from his injuries. The police later recovered nine shell casings from the scene, all of which came from a recovered .40-caliber handgun that Co-Defendant King admitted he had used during the crimes.

Before the home invasion began, neighbors had called 911 to report the suspicious activities of the Petitioner and his co-defendants, who arrived to the neighborhood in Co-Defendant King's car and in the Petitioner's green Jeep. The pertinent portion of the prosecutor's recitation of facts concerning the 911 calls reads as follows:

> On . . . a street before you get to Valley View [the murder victim's street], neighbors happened to be watching television, and they looked outside, and they noticed a Jeep that parked in an apartment complex next to their. . . home, and . . . what stood out to them was that they noticed getting out of the Jeep three individuals, and they described the individuals as three black men. They noticed the driver to get out, along with two other individuals from this Jeep. The one person was described as wearing black pants and dressed all in black. The other two were described as wearing shorts. They described two of the individuals as having backpacks and one of the individuals as having a long gun, and this phone call was about 1:50 a.m. on June 26, 2014.

> Across the block on Valley View, there is another apartment complex, and there happened to be a lady who just got off of work. She returned home. She's Spanish-speaking. She called 911, asked for a Spanish-speaking call

- 3 -

processor. Unfortunately, there was not one available. So her son got on the phone and attempted to interpret for her, and what she reported to the 911 processor was that there was a car - - there was four individuals who was [sic] there in the parking lot, walking around, looked suspicious.

The police, they began to circulate the area, and in circulating the area, they are on Whittle Springs Road, because what was lost in the translation was it wasn't . . . Whittle Springs. It was Valley View, but the police thought it was Whittle Springs. As the police are looking for this Jeep, a green Jeep, the three individuals from the Jeep meet up with the four individuals from the car, and they walk up to the victim's house.

The prosecutor stated that the proof would show that police officers who were already searching for the suspicious individuals reported by neighbors were able to respond quickly to Ms. Smith's 911 call about the home invasion. The prosecutor stated that one of the neighbors had reported the tag number of the Petitioner's green Jeep, and within an hour and a half of the crimes, the police located the Petitioner driving the vehicle with Co-Defendants Curtis, King and Byrd as passengers. Co-Defendant Curtis had a gunshot wound to his arm and gave a statement to police describing how he and his co-defendants had gathered with the plan of entering the victim's house to rob its occupants of their marijuana in order "to smoke their marijuana and profit from the marijuana." Co-Defendant Curtis identified all of the co-defendants charged in the indictment as participants in the crimes. Co-Defendants Byrd and King also gave statements to police in which they identified the Petitioner and the other co-defendants as fellow participants in the crimes. In addition, the Petitioner and Co-Defendants King and Curtis talked together about the crimes as they were being processed at the Knox County Sheriff's Office, and an inmate by the name of Hurst overheard their conversation. Co-Defendant Love also confessed his role in the crimes to a friend and told a coworker that he would have to "go away for a long period of time."

On March 24, 2016, the Petitioner filed a timely pro se petition for post-conviction relief alleging, among other things, "that the ineffective assistance of his trial counsel rendered his guilty pleas unknowing and involuntary." *Bennett v. State*, No. E2016-02276-CCA-R9-PC, 2018 WL 585472, at *1 (Tenn. Crim. App. Oct. 10, 2017). Following the appointment of post-conviction counsel, he filed an application for Rule 9 interlocutory appeal to this court, which was granted, to address the State's discovery obligations in a post-conviction proceeding. This court

affirm[ed] the post-conviction court's conclusion that the State has an affirmative duty to provide Rule 16 discovery materials within the context of

- 4 -

the post-conviction proceeding and reverse[d] and remand[ed] for reconsideration the post-conviction court's holding that Rule 16 discovery was not relevant to any issue raised in the initial pro se post-conviction petition.

*Id*. at *8.

The Petitioner subsequently filed an amended petition in which he renewed his claims of unknowing and involuntary guilty pleas and ineffective assistance of counsel and added a claim of cumulative error. An evidentiary hearing was held over various dates in 2022 and early 2023. Senior trial counsel, a 1998 law school graduate who had founded his own law firm and had extensive experience in criminal law, testified that he was retained by the Petitioner's mother to represent the Petitioner. He was assisted by the following members of his firm: a former associate attorney ("former associate trial counsel"); an attorney who was hired as a replacement at about the same time that former associate trial counsel left the firm ("junior trial counsel"); a woman who worked as his law clerk during the pendency of the Petitioner's case but was currently an associate at the firm ("law clerk"); George Lambert, a former agent with the Federal Bureau of Investigation who worked as the firm's investigator; and Angi Alred, senior trial counsel's paralegal.

Post-conviction counsel introduced numerous documents as exhibits to the hearing, including documents obtained from senior trial counsel's file of the Petitioner's case. Senior trial counsel identified one of those documents from his file as a summary of the Petitioner's charges, which he believed had been prepared by former associate trial counsel. Senior trial counsel testified that it was standard practice in his office for someone to prepare a summary of charges at the beginning of a case. From his review of his file, he knew that Mr. Lambert debriefed the Petitioner in person within a few days of his firm's being retained, and that former associate trial counsel and junior trial counsel also visited the Petitioner at various points. He did not know if anyone took the summary of charges on those visits, but he was confident that they would have taken the indictment, explaining that it was his firm's standard practice to review the indictment with each client.

Senior trial counsel testified that the Petitioner sent an email to his office on September 10, 2015, in which he brought up the possibility of pursuing a plea agreement for facilitation. He also recalled that he and the prosecutor had some conversations about a plea offer but could not remember who initiated them. He had no memory of a forty-eight-year offer; what he recalled was an offer from the State to "plead straight up . . . the Counts of the Indictment" with the exception of the felony murder count, which was to be

amended to facilitation for an effective sentence of forty years. His recollection was that the offer was made the weekend before trial.

Senior trial counsel identified the Petitioner's waiver of trial by jury and request for acceptance of guilty plea, which the Petitioner signed on September 14, 2015, the day that the trial was scheduled to begin. He testified that he and junior trial counsel together met with the Petitioner that morning, and that junior trial counsel prepared the handwritten portions of the form. When asked to look at pages two and three, on which the indicted offenses and sentence ranges were handwritten, he acknowledged the following errors: the three counts of aggravated burglary were erroneously listed as Class C felonies with a possible range of punishment of three to six years, instead of Class B felonies; an aggravated assault was erroneously listed as a Class C rather than a Class B felony; and four counts of attempted especially aggravated robbery were erroneously listed as Class A felonies. He further acknowledged that the summary of charges prepared by former associate trial counsel erroneously listed the aggravated burglaries as Class C felonies, erroneously listed the firearm count as having a release eligibility percentage of thirty percent, and erroneously listed a thirty percent release eligibility date for all the especially aggravated kidnapping counts of the indictment.

Senior trial counsel's recollection was that both he and junior trial counsel reviewed and explained the waiver of rights with the Petitioner after junior trial counsel prepared it. When asked if he noticed the discrepancy between the charges as listed on pages two and three of the form and the charges to which the Petitioner pled, he responded that he did not recall but that the information was obviously not corrected on the waiver form. He stated that his "focus was on the Counts that [the Petitioner] was pleading to at the time"; had he noticed the discrepancies, he would have had them corrected.

When asked what involvement he had in drafting the motion for severance, senior trial counsel responded that there were some *Bruton* issues discussed during a staff meeting, and that he either dictated the motion or directed someone else to draft it for his review and signature. He then acknowledged that the summary of the charges in the first paragraph of the motion was incorrect. He did not believe that former associate trial counsel was still employed by his firm at the time that motion was drafted and could not recall who prepared the erroneous first paragraph of the motion.

Senior trial counsel could not recall if he accompanied former associate trial counsel on various legal visits reflected in the jail log. He explained that he would sometimes sign into the jail on his legal visits, but oftentimes he was allowed to bypass security and enter without signing in. He specifically recalled that he was not required to sign in when he visited the Petitioner on Sunday, September 13, 2015.

Senior trial counsel recalled that the "fairly hotly contested" preliminary hearing lasted a number of hours and that he was the lead attorney in cross-examining the witnesses. He could not remember if any of the witnesses at that hearing specifically identified the Petitioner but recalled that one witness identified someone who was tall and matched the Petitioner's description. Senior trial counsel estimated that the Petitioner was 6'3" or 6'4" in height. When directed by post-conviction counsel to a portion of the transcript of the preliminary hearing, he recalled "highlighting to the court that there was no specific eyewitness identification, only general descriptions of African American males." He also recalled that, in arguing that the Petitioner's case should not be bound over to the grand jury, he had highlighted the confusion among the witnesses regarding the number of intruders inside the house, the circumstantial nature of the identification of the Petitioner's Jeep, and the lack of credibility of the jailhouse informant.

Senior trial counsel agreed that the trial court issued its ruling on the Petitioner's motion to sever on May 11, 2015. When asked how he would characterize the trial court's ruling, he responded that he thought it very positive because it prevented the State from calling Mr. Hurst as a witness at trial:

> In terms of a trial strategy perspective, I thought the Court's ruling was very positive. Basically, what it left the State was the choice of whether to use Mr. Hurst or not use Mr. Hurst. Mr. Hurst's testimony [and] the video were extremely damaging as it related to [the Petitioner]. The video depicted [the Petitioner] demonstrating kicking one of the victims. So that was a very key point - - that's my understanding - - to what we were trying to do. So we felt we had a win-win. And I thought the Court analyzed the Bruton issue very correctly. And it basically forced [the prosecutor] not to call Hurst. So we viewed that as a positive.

Senior trial counsel identified the "Official Forensic Biology Report," which was produced as supplemental discovery by the State on June 2, 2015. When asked whether there was any item on that report that created any particular concern, he responded that "there was a DNA match as it related to . . . the toboggan that was found at the scene." He agreed that the report reflected that a partial DNA profile was obtained that was a mixture of genetic material in which the major contributor matched the Petitioner's DNA profile. He stated that it was concerning because it was new evidence that was "potentially inculpating, as it related to [the Petitioner] and his defense." He said his office reviewed and discussed the report but did not file any motions relating to it because the Petitioner's DNA on an item from the crime scene was not surprising. From the beginning, the Petitioner had admitted to senior trial counsel and his staff that he had been present at the crime scene and that he had a weapon:

Because, from the very beginning, when [the Petitioner] was debriefed, he indicated he was there. He indicated that he had a firearm. The 911 call puts him there. You've reviewed the preliminary hearing transcript. The green Jeep was [the Petitioner's]. Witnesses put him there. The co-defendants put him there, in their statements, Byrd, Curtis.

So, you know, what we were trying to do was separate and mitigate [the Petitioner's] involvement. Whether that . . . was one of the kickers for the felony murder - - there were eight Counts of first-degree felony murder, et cetera. You know, it - - it wasn't a positive when you had DNA linking your client. But was it a surprise on what we knew or what our theory was that would prompt us to go further? No.

Senior trial counsel testified that he discussed the DNA report with the Petitioner "at - - some point in time" but could not recall exactly "when or where." When pressed, he repeated that he could not recall when or where but was certain that he had a conversation with the Petitioner about the DNA results and indicated it was in the context of a discussion about the Petitioner's constantly changing accounts and his repeated jailhouse phone calls. He said his office did not interview the Tennessee Bureau of Investigation ("TBI") agent who performed the DNA analysis of the toboggan and did not do any legal research regarding the DNA found because they were not "focused on the battle of the DNA, but rather, if the State could prove the kickers for the felony murder alleged in the indictment."

Challenged by post-conviction counsel about the number of visits he had with the Petitioner, senior trial counsel repeated that many of his meetings with the Petitioner were not reflected in the jail log. He testified that the jail staff was "professionally accommodating at times" and, as an example, related that on the Sunday that the prosecutor extended the plea offer, he called Chief Tramel[1] to tell him that he was busy preparing for trial but needed to go over a potential plea offer with the Petitioner. He said Chief Tramel told him that he would make a phone call and that senior trial counsel should come in through the back door. Senior trial counsel then called Co-Defendant Love's trial counsel to tell him that he would have Chief Tramel also "pull [Co-Defendant Love.]" Senior trial counsel testified that when he arrived at the jail and walked in the back door, "[the Petitioner] was waiting."

---

[1] We note that the post-conviction court spelled this individual's name as "Trammell" in its order denying the petition. We use the spelling contained in the transcript.

Senior trial counsel acknowledged he did not interview the officers listed on the indictment but said that they interviewed every witness the Petitioner "asked [them] to interview that [the Petitioner] felt could have had relevant evidence to what was going on[,]" and reviewed discovery, which included interrogations, police videos, and summaries. He stated that they did not interview the victims who testified at the preliminary hearing because they felt that "their testimony was very positive as it related to [the Petitioner]." He acknowledged they had not issued any trial subpoenas for defense witnesses as of September 7, 2015. He explained that their defense strategy was focused on defending against the felony murder charges and attempting to minimize the Petitioner's role in the crimes, and that they did not identify anyone not already on the State's witness list that they thought would be helpful to that reasonable doubt defense.

Senior trial counsel agreed that none of the victims was able to identify the Petitioner and no forensic evidence placed him inside the house. When asked if they investigated the possibility of "a suppression issue predicated on the legal justification for the [automobile] stop[,]" he responded that they thought of it but decided to file an ultimately unsuccessful motion in limine regarding the hearsay statements that led to the stop. He said they were aware of a number of 911 calls regarding the Jeep, and it "came on [their] radar" that a BOLO had been issued with a tag number provided by an unidentified witness to Knoxville Police Department ("KPD") Officer Kuykendall. Senior trial counsel testified that they were concerned that the unidentified tipster would not be subject to cross-examination, and therefore were "doing everything [they could] to not have that information brought before the jury and allow Kuykendall to testify to hearsay, without the ability to cross-examine the declarant."

Senior trial counsel conceded that he did not interview Officer Kuykendall and did not know if Officer Kuykendall was the actual source of the tag number relayed by the citizen informant. He said that in some respects, they were on a fishing expedition. He stated that they reviewed all the discovery, including the search warrant and the information retrieved from the Petitioner's cell phone, and he believed that he addressed the issue in the motion in limine. When asked if he would have pursued the source of the tag number had it "come on [his] radar earlier that in discovery there was specific information related to this tag number and how it was obtained," he replied that he could not say at the current time what they would have pursued, but that they filed what they "felt was appropriate in terms of the motion to sever, the motion for a 12(d)(2) notification, based on the volume of evidence that [they] received, the motion in limine."

Asked if he recalled the Petitioner's having said in a jailhouse phone call that he "ran away like a b****," senior trial counsel testified that he could not recall the specifics

of every one of the Petitioner's jailhouse phone calls, but that the Petitioner's repeated phone calls were of great concern:

> There were a number of jail calls. I was concerned. I asked him to quit giving statements on the jailhouse calls to individuals that were not covered by the attorney-client privilege. I think at one point he started whispering. And I - - because the story was changing so significantly, I think we had a memo to the file regarding [the Petitioner's] potentially testifying truthfully.
>
> So there was a number of calls. And we felt they were extremely problematic as to what he was saying to people that was not covered by the attorney-client privilege. We were experiencing a changing narrative. So there was a variety of calls during the tenure of our representation.

Senior trial counsel testified that the prosecutor expressed her belief that the Petitioner played a leadership role in the crimes, which was why she wanted the Petitioner to be debriefed as part of his plea deal. He repeated that he had no memory of any initial offer that involved a sentence of forty-eight years. He recalled only the forty-year offer and some discussions with the prosecutor about the effective net sentence with respect to how the sentences would be stacked. He said that his staff was preparing for the Monday trial throughout the entire preceding weekend. The prosecutor extended the offer that Sunday, and when he presented it to the Petitioner during their meeting at the jail, the Petitioner wanted time to think about it. The next morning, he and junior trial counsel met with the Petitioner in a back room at the courthouse, where they reviewed the offer with him. He testified that the Petitioner wanted to know if Co-Defendant Love was taking the offer before he decided to accept it. Senior trial counsel said that both he and junior trial counsel asked the Petitioner if he understood the offer and if he was comfortable with his decision to plead guilty. The Petitioner appeared to understand the plea agreement, to be making an intelligent decision regarding his acceptance of the plea deal, and to be "steadfast and comfortable in his decision."

Senior trial counsel testified that one month after he had entered his pleas, the Petitioner emailed senior trial counsel's office wanting to know if his plea deal was still good because Co-Defendants Byrd and Curtis had testified in Co-Defendant King's trial but the Petitioner had not. In addition, a short time after being debriefed, the Petitioner contacted senior trial counsel's office to express his desire to be transferred to the TDOC. The Petitioner never expressed any buyer's remorse or other concerns, and both senior and junior trial counsel "felt comfortable that morning that he made a knowing, intelligent, voluntary decision."

- 10 -

Cross-examination of senior trial counsel occurred at a later date, and after senior trial counsel had obviously refreshed his memory with a review of his file. Senior trial counsel testified that Mr. Lambert asked the Petitioner three questions during his initial debriefing interview: whether he was at the home, whether he had a gun, and whether he had told him the truth. The Petitioner's responses to those questions, along with the Petitioner's interactions with other members of senior trial counsel's staff, "set the stage for the direction [they]were going to take."

The Petitioner's story to counsel, however, kept changing, resulting in a series of inconsistent accounts. Senior trial counsel testified that the toboggan was significant because it was located outside the victim's fence, which provided a "potential defense that [the Petitioner] never breached the fence, but, again, his story evolved and changed over time." The Petitioner struck him as someone who was very intelligent but also very naïve, thinking that he could change his story "to kind of fit - - explain felony murder, so he wanted to jump over the fence, back over the fence, back door, front door, you know, so it kind of changed."

Senior trial counsel testified that the *Bruton* issue arose from the outset due to the fact that there were five co-defendants. He said that the problem with a motion to suppress was that the license plate of the Petitioner's Jeep had been reported in a 911 call, and the Jeep with that license plate had returned to the crime scene. He testified that a citizen by the name of Mr. Mount described the Jeep in a 911 call, and he believed that Mr. Mount's wife reported the license plate number while her husband was on the phone. He said they filed the motion in limine in an attempt to keep those hearsay statements out, and to "lock [the prosecutor] in to changing [her] theory of the case[.]" Senior trial counsel testified that although he did not file motions merely for the sake of filing motions, there was always an aspect of "playing a legal game of chess" with the prosecutor, "trying to get [the prosecutor] to change [her] story," because he "knew that if [Co-Defendants] Curtis and Byrd flipped, that would be a problem."

Senior trial counsel testified that he had no advance notice of the damaging testimony of Mr. Hurst, whom senior trial counsel dubbed the "super snitch[,]" until the preliminary hearing. He said he asked the Petitioner if he had said anything in front of Mr. Hurst, and the Petitioner replied "no[.]" Senior trial counsel described it as "kind of a mic drop moment" when the prosecutor put Mr. Hurst on the stand and they realized that he was going to be a problem. He agreed that the State not only had Mr. Hurst's testimony, but also a video from the detention center that showed the Petitioner demonstrating kicking, which corroborated Mr. Hurst's account of what the Petitioner had said. In addition, Mr. Hurst used the phrase "long gun," which was consistent with how the other co-defendants described the Petitioner's weapon.

Senior trial counsel indicated that he expected the State to initiate plea negotiations after the trial court issued its ruling on the motion to sever, which, in essence, prohibited the State from using Mr. Hurst as a trial witness unless the cases were severed. He said he thought the State might make an offer to both the Petitioner and Co-Defendant Love because the State's case against them was the weakest in the respect that they both had the wherewithal not to give incriminating statements. When no offer was forthcoming, he realized that the State thought its case against the Petitioner was strong.

Senior trial counsel testified that the trial was continued from the initial June trial setting due to the late receipt of the DNA report. He said an expert "wasn't going to change [his] theory," pointing out that the toboggan was found outside the fence, which did not hurt his case. He said that rather than objecting to the entire report, they were going to object to the report's coming in in its entirety or request that it "at least be redacted as it related to all the different DNA." He explained that he thought that evidence of the DNA of someone other than the Petitioner could help their case if the portion of the report stating that the co-defendants had been excluded as contributors was eliminated.

Senior trial counsel testified that they were preparing for trial, and were not pushing to work out a plea deal. He had a vivid memory of a motion hearing one week before trial where he saw the attorneys who represented Co-Defendants Byrd and Curtis talking to the prosecutor during a break. Senior trial counsel expressed his concern to Co-Defendant Love's trial counsel that the other attorneys might be trying to "flip and take a deal[,]" and at the conclusion of the hearing directly asked the prosecutor, who confirmed it. Senior trial counsel described it as a "game changer" that caused significant concern because they now had two people who put the armed Petitioner inside the house.

Senior trial counsel testified that they received the email from the Petitioner asking about the possibility of a deal involving facilitation, which was then followed by another email stating that he wanted to go to trial. He said he informed his staff that he did not think they had a realistic chance of any offers, and that all of them continued their intense preparation for trial, which included working throughout the weekend. At approximately 4:30 p.m. that Sunday afternoon, while he was meeting with the Petitioner's mother at his office, the prosecutor called to extend the offer of twenty-five years at 100% to the especially aggravated kidnapping and fifteen years at 30% for the facilitation of felony murder, "stacked to the hard 25."

Senior trial counsel repeated his account of how he called Co-Defendant Love's trial counsel and arranged with Chief Tramel for them to visit with their respective clients in the jail. He recalled that after he explained the entire offer to the Petitioner in detail, the Petitioner responded that if Co-Defendant Love accepted the offer, he would too. Senior

trial counsel said that he told the Petitioner that he did not want him to decide right then, to think about it overnight, and that they would talk again in the morning. When he returned to his office, he told Ms. Alred that he thought they might have a deal but cautioned her not to mention anything about that possibility to junior trial counsel or to law clerk. The next morning, he and junior trial counsel had the conversation with the Petitioner in the back room of the courthouse in which the Petitioner told them that he wanted to accept the offer.

Senior trial counsel testified that Co-Defendant King's trial was continued due to the change in the number of co-defendants that would potentially be testifying against him at trial. Approximately thirty days after the Petitioner entered his pleas, and after Co-Defendant King's trial had concluded, the Petitioner's judgments were entered. Before the judgments were entered, the Petitioner sent senior trial counsel's office the email in which he expressed his concern that his deal might not still be on because he had not been called as a witness at Co-Defendant King's trial, followed by the email inquiring if his transfer to TDOC could be expedited. The Petitioner never communicated that he did not understand the plea and never complained about senior trial counsel's representation. Several months after the Petitioner was transferred to TDOC, the Petitioner's mother reached out to senior trial counsel's office about a problem with some of the numbers in the judgment, and his office was able to get a corrected judgment entered. Senior trial counsel testified that throughout the course of his representation and beyond, he had a "very good relationship" with the Petitioner's mother and "nothing but very positive communication" with the family.

With respect to the Petitioner's decision to plead guilty, senior trial counsel testified that the very intelligent Petitioner "understood the domino effect of people cooperating, the change in dynamics." However, senior trial counsel was prepared to go to trial if the Petitioner had rejected the State's offer, and he would not have recommended that the Petitioner accept the plea if he had thought the Petitioner was not making a knowing, intelligent, and voluntary decision.

Junior trial counsel testified that he was licensed to practice law in 2013 and was currently employed as an assistant district attorney at the Knox County District Attorney's Office. To the best of his recollection, the Petitioner's case was either in the grand jury or just returned from the grand jury at the time he began his employment with senior trial counsel's law firm. He said that he was essentially hired to replace former associate trial counsel, and that his role was to assist senior trial counsel, who took the lead on the case. He stated that the Petitioner was a young man in his early 20s who, to the best of his recollection, had no criminal record. He said that he met with the Petitioner several times over the course of his representation and, although he had no specific memory of it with

- 13 -

the Petitioner, his general practice was to review the charges and relevant statutes with each client.

Junior trial counsel testified that the Petitioner was warned that jail calls were monitored and recorded but did not heed their advice not to discuss the case on jail calls. He recalled that in a video call, the Petitioner placed himself at the scene, saying that he was not concerned because he did not go in the house. He also recalled a video of the Petitioner in the back seat of a police car with one of his co-defendants, which showed the Petitioner "essentially telling that individual what to say." There were "quite a few communications[,]" but those were the two that "stuck with [him] over six years." To the best of his recollection, law clerk prepared a discovery index, and he reviewed the discovery in the case. He had no specific memory of listening to the 911 calls but said it was something that he would have done in his preparation of the case. Likewise, although he had no specific recollection of reviewing discovery with the Petitioner, it was something that he would have done.

Junior trial counsel recalled reviewing the DNA report on the toboggan and said it was significant because it was additional evidence that placed the Petitioner at the scene. He said he would have watched the officer body camera video of the stop of the Petitioner's Jeep. He was unaware of any legal basis to suppress the stop, "given the matching descriptions and where the vehicle was located and the proximity between the shooting and when that vehicle was seen again."

Junior trial counsel recalled that there was a court hearing leading up to the trial, and perhaps some conversations about an offer being extended to some of the co-defendants. However, the State was unwilling to extend an offer to the Petitioner at that time because the prosecutor believed the Petitioner was a leader in the offense. He had a clear memory of the conversation that he and senior trial counsel had with the Petitioner on the morning of trial about the plea offer that was ultimately extended, and of the Petitioner's "being very inquisitive as to what [Co-Defendant] Love was going to do[.]" He recalled that Co-Defendant Love's trial counsel let them know that Co-Defendant Love had accepted the offer.

Junior trial counsel recalled having had a discussion with the Petitioner about criminal responsibility, and how the Petitioner, not unlike other individuals in a similar situation, indicated that he thought it unfair that he could be facing a life sentence for felony murder when he had not killed anyone. Junior trial counsel stated that the case would been a hard one to defend, but that they were prepared to go to trial. Had they proceeded to trial, they would have attempted to impeach the State's witnesses, to show that the State's

witnesses had an incentive to exaggerate the Petitioner's role in the offenses, and to hold the State to its burden of proving the offenses beyond a reasonable doubt.

When asked about his Thursday, September 10, 2015 legal visit with the Petitioner that was reflected in the jail log, junior trial counsel testified that he recalled having a general conversation about where the case was and why resolving it with a plea deal might be beneficial. However, it would have been contingent on the State's extending an offer for the Petitioner to accept, which had not happened at that point. Junior trial counsel identified an email the Petitioner sent at 8:52 a.m. the next day to Ms. Alred, which read: "I'm going all the way with this. Let's do it." He had no memory of having asked the Petitioner to send that email or of any sort of conversation on September 10 in which he asked the Petitioner to let him know what he wanted to do.

Junior trial counsel recalled working on the Saturday preceding the Monday trial date. He could not remember if he worked on Sunday as well but said it was entirely possible that he did. He recalled that he brought files with him to the courtroom on Monday in anticipation of a trial, that Co-Defendant Love's trial counsel approached to inform him that Co-Defendant Love had decided to accept an offer, and that he and senior trial counsel then had the conversation with the Petitioner about accepting the plea offer, which junior trial counsel understood had been extended the previous day. Junior trial counsel had no specific recollection of reviewing the rights paperwork with the Petitioner. He said he was the one who filled out the plea paperwork. He could not recall if the Petitioner signed it in the room where he and senior trial counsel discussed it with him, or at counsel table in the courtroom. He had no memory of being in the courtroom during the plea colloquy but did recall being present one month later when the judgments were entered. He recalled listening to the victim impact statements and that the Petitioner expressed remorse by apologizing for his actions.

On cross-examination, junior trial counsel was asked about various emails exchanged between the Petitioner and senior trial counsel's law firm. These included a March 10, 2015 email that the Petitioner sent to Ms. Alred indicating that he was interested in a plea deal of probation; an April 16, 2015 email that the Petitioner sent to Ms. Alred in which he, among other things, stated that his mother told him that senior trial counsel was "not a man to strike a deal[,]" but if the Petitioner felt that a deal was best, that was what he wanted; a May 19, 2015 email from the Petitioner to Ms. Alred stating that he wanted to talk to junior trial counsel and that he might have an alibi but was unsure if he should use it; a September 10, 2015 email from Ms. Alred to the Petitioner with a message from senior trial counsel that he was confirming that they had met with the Petitioner to discuss the new dynamics of the case regarding the DNA and the fact that two co-defendants were now cooperating with the State, and that senior trial counsel had been "clear and

- 15 -

unequivocal" that the Petitioner could not make false statements should he testify at trial; an October 14, 2015 email from the Petitioner to Ms. Alred stating that he needed to speak to junior trial counsel and inquiring whether his deal was still on because Co-Defendants Curtis and Byrd had testified at Co-Defendant King's trial; and an October 16, 2015 email from the Petitioner to Ms. Alred wanting to know if he could get a speedy transport now that he had "produced [his] statement[.]" Junior trial counsel testified that he thought the Petitioner had some concerns that his plea agreement would be impacted by not having testified at Co-Defendant King's trial.

Junior trial counsel testified that the Petitioner initially indicated to him that he went to the murder victim's house with the intent to purchase marijuana and that he had a gun with him. Ultimately, the Petitioner changed his story, admitting that he had gone to the house with the intent, with others, of committing a robbery. The Petitioner's admissions to junior trial counsel, combined with the information junior trial counsel reviewed in discovery, made the Petitioner's suggestion of an alibi "obviously very concerning." Junior trial counsel recalled that the conversation in which the Petitioner suggested that he could come up with an alibi occurred at the Knox County Detention Center in the presence of law clerk. He said he was very concerned at the Petitioner's suggestion, and that he conveyed his concern to senior trial counsel, who shared his concern.

TBI Forensic Scientist Kim Lowe, the expert in forensic biology who analyzed the DNA on the black toboggan, described her testing process and the difference between touch DNA, left by someone casually touching an item, and wearer's DNA, created when someone deposits his DNA on an item of clothing he is wearing. She testified that the partial DNA profile obtained from the toboggan was a mixture of genetic material from at least three individuals, one of which was male, and that the major contributor was the Petitioner. She said she was unable to determine who last wore the toboggan and when the Petitioner deposited his DNA on it. She stated that no one from senior trial counsel's law firm ever contacted her about the report and agreed that, had they done so, she would have been able to explain to them "what can and cannot be determined based on wearer's DNA and major contributors[.]"

The Petitioner testified that he was currently twenty-nine years old, had been arrested on June 26, 2014, and, to date, had been incarcerated for seven years, eleven months, and thirteen days. He said that his mother retained senior trial counsel to represent him within three or four days of his arrest. He recalled that he first met with senior trial counsel in a conference room on the top floor of the detention center. Senior trial counsel spoke well, dressed well, and carried himself in a manner that impressed the Petitioner. The Petitioner said that he was twenty-one years old at the time of his arrest, had never

before been arrested, had never been represented by a lawyer, and had never seen a real trial.

The Petitioner testified that the first major court hearing in his case was the preliminary hearing. He thought senior trial counsel did a really great job at that hearing; senior trial counsel "was a dog" and "a beast" and "everything that [the Petitioner] wanted him to be." Senior trial counsel "went after" the witnesses and was "aggressive" with Mr. Hurst, who said that the Petitioner had told him that the Petitioner "kicked down the front door with a chopper." Senior trial counsel did a good job of challenging Mr. Hurst's credibility, and the Petitioner was very pleased with his performance.

The Petitioner testified that he first met junior trial counsel when junior trial counsel and former associate trial counsel came to visit him at the detention facility on November 12, 2014. During that meeting, junior trial counsel explained that he was going to be "just filling in with [former associate trial counsel]." The Petitioner could not recall when his indictment was returned but remembered that junior trial counsel, probably accompanied by former associate trial counsel, brought him a copy of the indictment, which scared him with its number of felony counts. The Petitioner identified the summary of charges prepared by former associate trial counsel as a document that one of his attorneys showed him to let him know what his offenses were and the sentence range for each offense. He stated that he did not learn that the summary was inaccurate until he and post-conviction counsel were reviewing the file. Similarly, he did not learn that the summarization of charges on pages two and three of his waiver of trial form was inaccurate until his review of the document with post-conviction counsel. When he learned of the inaccuracies on those documents, he felt a mixture of emotions, foremost of which was a feeling of being hurt that senior trial counsel, who was supposed to have his best interest at heart, was not looking out for him.

The Petitioner testified that he was informed at some point that law clerk would be replacing former associate trial counsel, who had left the firm. He said that his lawyers reviewed the discovery materials with him "piece by piece" and that there was so much of it that it seemed as if every legal visit was about discovery. He stated that his attorneys discussed motions with him, and that the most important one appeared to be the motion to sever. He said that senior trial counsel explained they were going to try to sever his case from his co-defendants so that he could be tried alone, but that it would be a challenge. He recalled that senior trial counsel told him that the trial court's ruling on that motion was a positive outcome. He said he took senior trial counsel at his word but would have preferred to be tried alone.

Referring to a timeline of hearings and attorney visits that post-conviction counsel had prepared, the Petitioner testified that, after a May 26, 2015 court hearing, he did not

receive any legal visits until September 8, 2015. He described it as a "dead period" during which he did nothing but watch television and wonder where his attorneys were. Referring to the log of jail visits, the Petitioner testified that junior trial counsel visited him for approximately three hours during that September 8, 2015 legal visit. He recalled that the meeting was mostly about discovery, and that he was frustrated because it was the first time that he heard of the toboggan DNA report. He said he did not learn that his attorneys had received the report on June 2, 2015 until he and post-conviction counsel were reviewing the file. When he found out that his attorneys had known about the report on June 2 but failed to inform him until September 8, he cried. Had he known earlier about the report, he would have inquired how DNA works, the pros and cons of the report, and how the information contained in the report might be used to help his case.

The Petitioner testified that his attorneys never discussed trial strategy with him, the exhibits, their thoughts on opening, or any specifics about what they planned to do at trial. No one ever told him that the jury would be required to work through each of the twenty-five charges at trial, and he surmised on his own that it was a "one for all" situation, where if he "beat the felony murder, then [he] beat everything" but if he did not beat the felony murder charge, he would be convicted of everything. He had no understanding of lesser-included offenses, no one ever told him how the jury would be instructed with respect to accomplice testimony, and he was never informed about the voir dire process.

The Petitioner testified that in a meeting at the courthouse after the September 10, 2015 court hearing, senior and junior trial counsel informed him that his co-defendants were "flipping," that the prosecutor wanted him to get the maximum time because she thought he was a leader in the commission of the offenses, and that it would be a hard case to beat. He said that senior trial counsel told him that both Co-Defendants Byrd and Curtis would testify that the Petitioner entered the house with a gun. The Petitioner stated that it was only later, through post-conviction counsel, that he learned that was not an accurate assessment of their testimony because only one of the co-defendants testified at Co-Defendant King's trial that the Petitioner went into the house.

The Petitioner testified that he sent an email that night to senior trial counsel's law firm asking for senior trial counsel to try for a deal for facilitation. He said the first time he heard the word facilitation was earlier that day when senior trial counsel mentioned it during their meeting. Junior trial counsel visited him at the jail that evening and again on Friday, September 11, 2015, but no one from senior trial counsel's law firm came to see him on the Saturday or Sunday before the trial. The Petitioner testified that he viewed senior trial counsel's testimony that he visited with him at the jail that Sunday as "just more of the betrayal." The Petitioner also disputed senior trial counsel's testimony that Co-Defendant Love's trial counsel visited Co-Defendant Love that Sunday at the same facility

- 18 -

where the Petitioner was housed, testifying that Co-Defendant Love was at a different facility at that time.

The Petitioner testified that he did not learn of the proposed plea deal until the Monday morning of trial when senior and junior trial counsel met with him in the holding tank to tell him that the prosecutor was offering him the same plea deal as his co-defendants. Senior trial counsel asked him if he wanted to accept it, and he told him no. The Petitioner testified that he was "trying to wrap [his] mind around how do we go from we're ready for trial to the first conversation we have on Monday morning is a 40-year sentence?" He stated that senior trial counsel told him that he did not have to accept the plea. However, senior trial counsel did not say that he was ready for trial, and the Petitioner sensed that senior trial counsel did not have the same energy that he had exhibited in the past. He recalled that senior trial counsel told him that it would be best for him to accept the plea, and that he should look on the bright side and realize that he would be only forty-four or forty-five, the approximate age of junior trial counsel, when released from prison. Although senior trial counsel did not say so, the Petitioner knew that senior trial counsel thought that forty years was the best that they could do.

The Petitioner testified that during his conversation with senior trial counsel, junior trial counsel was already filling out the paperwork. He said that senior trial counsel then reviewed the paperwork with him, "kind of skim[ming] through" the rights he would be waiving by entering his guilty pleas. He was not certain but thought it was possible that senior trial counsel also explained the questions that he would be asked by the trial court during the plea colloquy.

The Petitioner testified that he asked senior trial counsel if he could have a minute to think about it. Junior trial counsel left the waiver on a chair, and senior and junior trial counsel left him alone for five or ten minutes. The Petitioner said that he picked up the packet of materials, looked at it, and "instantly start[ed] to cry." He then thought about how senior trial counsel appeared to lack the fire that he had exhibited at the preliminary hearing. The Petitioner said he had thought that senior trial counsel was ready for trial, until he found out that morning that he was not. Because he could not go to trial with an attorney who was not ready, he tearfully signed the paperwork and then answered the questions posed by the trial court during the plea colloquy. He said that the trial court never asked him whether he thought senior trial counsel was prepared for trial that day. Had he been asked that question, he would have responded that he wanted to fire senior trial counsel and start over with a different attorney, even if he had to be represented by a public defender.

On cross-examination, the Petitioner acknowledged that he had been enrolled in college for approximately a year and a half before the crimes, and that he was a good student. He admitted that he went to the house with his co-defendants and that he had a long gun but denied that he entered the house, testifying that he was in the backyard with a co-defendant ready to enter when someone in the house screamed and he jumped back over the fence and ran to his Jeep. He acknowledged that he initially left the scene in his Jeep with Co-defendants Curtis and Love but returned to pick up Co-Defendant Byrd, and was then stopped by the police and arrested. He denied that he attempted to convince Co-Defendant Byrd to change his story, explaining that he was merely upset that Co-Defendant Byrd falsely told the police that he had run inside the house with his long gun. He admitted that he and his co-defendants talked together in the presence of Mr. Hurst while in a holding cell but denied that he demonstrated to Mr. Hurst how he had kicked in the door. He explained the kicking video as his having demonstrated what his co-defendants had falsely told the police that he had done.

The Petitioner acknowledged that Mr. Hurst testified at the preliminary hearing that he told him he "kick[ed] in the door with the chopper." He could not recall any witness testifying that there was a tall man with a long gun in the kitchen of the house. He said he was not the tallest member of the group, and that the one who was not charged in the indictment, Felix Netherland, whom he knew as BJ, was 6'4" or 6' 5" tall while he was only 6'3". He acknowledged there was some discussion at the preliminary hearing about criminal responsibility, and that he was therefore at least aware of the concept. He further acknowledged that he admitted to Mr. Lambert that he was "part of the discussion to go to the house to rob them of marijuana [,]" and that he was armed with a gun. He admitted he sent emails to his attorneys about the possibility of a plea and in a recorded jailhouse phone call with a friend spoke of watching "Law and Order" and of knowing that "the person first in gets the best deal[.]" The Petitioner further acknowledged that he told the trial court that he was satisfied with the representation of his trial counsel, that he was guilty, and that he had no questions. He testified, however, that although he knew that facilitate meant to help, he did not understand that he was pleading guilty to a lesser-included offense of felony murder.

On redirect examination, the Petitioner agreed that the jail logs reflected that Co-Defendant Love was housed at the Knox County Detention Center on the weekend prior to the scheduled start of trial, while the Petitioner was housed at the Knox County Jail.

The Petitioner's final witness was KPD Officer Ryan Kuykendall, who testified that as he was searching for the suspects in the area, a resident approached and gave him a description and tag number of a vehicle possibly involved in the shooting, which Officer Kuykendall then broadcast over his police radio. Officer Kuykendall said he did not know

the informant's name and had no further contact with him. He stated that no one from senior trial counsel's office ever talked to him. On cross-examination, he identified dashcam videos, previously admitted as an exhibit at the hearing, that were downloaded from his police cruiser on June 26, 2014 at approximately 2:10 and 3:18 a.m.

Co-Defendant Love's trial counsel, called as a witness by the State, corroborated senior trial counsel's testimony of how Chief Tramel arranged for him and senior trial counsel to enter the jail through the sally port on Sunday, September 13, 2015, so that they could talk to their respective clients about the State's plea offer. On cross-examination, he testified that the original offer from the State was for either forty-five or forty-eight years, which he negotiated down to forty years. When shown the records that reflected that his client was at a different facility on the date in question and asked if it refreshed his memory, he responded emphatically that he knew exactly where he met with his client that Sunday, and that it was downtown.

On November 15, 2022, the post-conviction court entered a lengthy written order denying the petition. Thereafter, the Petitioner filed a timely notice of appeal to this court.

## ANALYSIS

The Petitioner argues on appeal that the "totality of the circumstances, including the plea colloquy and evidence developed at post-conviction hearing, provide clear and convincing evidence" that his guilty pleas were not knowing, intelligent and voluntary; that his trial counsel were deficient in performance, resulting in prejudice to his case, for "failing to identify and investigate information that would have led to a successful motion to suppress the seizure of the vehicle" and "for failure to identify and investigate available information that would have benefitted [the Petitioner]'s defense regarding the scientific limitations on the conclusions that could be reached from the DNA extracted from the toboggan"; and that "the cumulative effect of trial counsel's errors and deficient performance magnifies the prejudicial effects . . . requiring post-conviction relief."

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of

witnesses or the weight of their testimony. *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citations omitted). However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. *Id.* (first citing *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); and then citing *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013)). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *Id.* at 400 (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (first citing *Strickland*, 466 U.S. at 688; and then citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim"). In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *House v. State*, 44 S.W.3d 508, 516 (Tenn. 2001).

In *Boykin v. Alabama*, 395 U.S. 238, 242 (1969), the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is knowing by questioning the defendant to make sure he or she fully understands the plea and its consequences. *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999); *Blankenship*, 858 S.W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. *Blankenship*, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) the defendant's familiarity with criminal proceedings; (3) whether the defendant was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against the defendant and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. *Id.* at 904-05.

In denying the petition, the post-conviction court specifically found senior trial counsel to be a credible witness, and the Petitioner not credible in aspects of his testimony, including why he accepted the plea deal. The post-conviction court found that the Petitioner "took the final plea offer because he believed that if the case went to trial he would likely be convicted and receive a longer sentence including a life sentence on the felony murder charge" but later experienced "buyer's remorse" about his decision. The post-conviction court further found that senior trial counsel was fully prepared for trial, "used the full resources of his firm to investigate the State's evidence and look for potential defenses in the case[,]" filed appropriate motions, formed a reasonable defense theory, and continued to prepare for trial up until the point that the Petitioner decided to accept the plea offer on the morning that trial was scheduled to begin. The post-conviction court found

- 23 -

that the record did not support the Petitioner's claim that his counsel did not fully inform him of the charges and possible sentences, and that the record showed that the Petitioner "completely understood the details of the plea offer." The post-conviction court therefore concluded that the Petitioner failed to meet his burden of demonstrating any deficiencies in the performance of his trial counsel or that his guilty pleas were not knowingly and voluntarily entered.

The record fully supports the findings and conclusions of the post-conviction court. Senior trial counsel, a very experienced criminal defense attorney whose testimony was specifically accredited by the post-conviction court, testified that he and his staff were fully prepared to proceed to trial had the Petitioner not accepted the State's last-minute plea offer. He stated that the Petitioner was informed of the charges he faced, the charges to which he would be pleading guilty, and the ramifications of the guilty pleas. Both he and junior trial counsel believed that the Petitioner understood the plea agreement and entered knowing, intelligent, and voluntary pleas. Senior trial counsel also provided a reasonable explanation for why he did not pursue a motion to suppress the results of the stop of the Petitioner's vehicle, and chose instead to rely on a motion in limine, as well as why he did not waste time researching or filing motions with respect to the toboggan DNA report.

Although the Petitioner had no prior familiarity with the criminal justice system, the record establishes that he was twenty-one-years-old, had completed approximately a year-and-a half of college, and was a good student. Senior trial counsel testified that the Petitioner appeared to be very intelligent and to understand the changing dynamics of the case caused by his co-defendants having agreed to enter plea agreements and to testify against the Petitioner at trial. Senior trial counsel's assessment of the Petitioner's understanding of the changing dynamics caused by his co-defendants' guilty pleas was corroborated by the Petitioner's jailhouse phone call to his friend in which he indicated familiarity with the guilty plea process from watching "Law and Order." Notably, the Petitioner never indicated to either the trial court or his trial counsel that he was unhappy with his plea deal or with counsel's representation, or that he did not understand his pleas. In fact, in the month that elapsed before his judgments were entered, the Petitioner reached out to his counsel indicating his concern that his plea deal would not go through because he had not been called as a State's witness at Co-Defendant King's trial.

From the record, there is more than enough proof to justify the post-conviction court's finding that there was no deficiency in the performance of the Petitioner's trial counsel. Trial counsel conducted a thorough investigation into the case and developed a cogent defense strategy. The Petitioner was kept informed of the progress in the case and gave input to his trial counsel about the facts and strategy. Trial counsel gave advice, informed by adequate investigation, that the Petitioner should accept the plea agreement,

and the Petitioner agreed. Nothing in the guilty plea hearing indicates that the Petitioner did not enter a knowing and intelligent guilty plea. In light of all this evidence, we agree with the post-conviction court that the Petitioner has not shown that either senior or junior trial counsel was deficient in his performance, or that his guilty pleas were unknowing and involuntary.

The Petitioner also argues that his trial counsel's alleged various deficiencies in performance magnifies their prejudicial effect, warranting post-conviction relief. The cumulative error doctrine requires relief when "multiple errors [are] committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted). However, there can be no cumulative error in the absence of any error. Accordingly, the Petitioner is not entitled to relief on the basis of his cumulative error claim.

## CONCLUSION

Based on our review, we affirm the judgment of the post-conviction court denying the petition for post-conviction relief.

_____
JOHN W. CAMPBELL, SR., JUDGE